IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TIRRELL A. MORTON,**

       **Plaintiff,**

**v.**                                     **Civil Action No. 3:12cv122**
                                                   **(Judge Groh)**
**JOHN SHEELEY, Administrator, Eastern**
**Regional Jail; GOV. EARL RAY TOMBLIN,**
**Governor of the State of West Virginia; and WEST**
**VIRGINIA REGIONAL JAIL AUTHORITY [sic],[1]**

       **Defendants.**

## AMENDED REPORT AND RECOMMENDATION[2]

### I.  Procedural History

On October 12, 2012, the *pro se* Plaintiff, an inmate formerly incarcerated at the Eastern

Regional Jail[3] ("ERJ") in Martinsburg, West Virginia as a pre-trial detainee, initiated this case by

filing a civil rights action pursuant to 42 U.S.C. §1983 against the above-named defendants.

In the original Complaint, Plaintiff alleged that the defendants violated his First Amendment

right to free exercise of religion; his Eighth Amendment right to be free from cruel and unusual

punishment; and his Fourteenth Amendment due process rights. He alleged that at the ERJ, there

were no (1) Islamic worship services, study classes, materials, activities, nor any  "Islamic

coordinator;" (2) the plumbing and sanitation was improper, with drain malfunction, mold growth in

the showers, and inadequate linen exchange; (3) fire prevention equipment was inadequate, and there

was a lack of adequate fire drills. (4) Further, the ERJ was overcrowded since its addition of top

bunks (without safety ladders for top bunk occupants) in its cells, and some inmates were required to

sleep on mattresses on the floor; (5) there was no grievance procedure or grievance forms available

---

[1] The actual name of the "West Virginia Regional Jail Authority" is West Virginia Regional Jail and Correctional Facility Authority ("the Authority").

[2] The sole purpose of the Amended Report and Recommendation is to make a specific recommendation on the defendants' Motion to Dismiss (Doc. 43). In all other respects, except for the date by which objections must be filed, this Amended Report and Recommendation is identical to the original.

[3] The plaintiff is presently incarcerated at the Northern Regional Jail in Moundsville, West Virginia.

to inmates; (6) staff's security rounds were inadequate ensure inmate safety; (7) constant lighting within the facility was detrimental to inmate health and wellbeing; (8) the facility had unsanitary food preparation, and the food that was served lacked adequate nutrition; (9) generally unsanitary conditions existed, including a lack of available cleaning supplies and inadequate ventilation; (10) there was a lack of secured USPS boxes for outgoing inmate mail; and (11) medical treatment and staffing was inadequate. The Plaintiff alleges that all of these conditions have caused him "excessive mental anguish," infringed on his constitutional rights, endangered his welfare, caused him to be "assaulted by staff," and denied him his "religious practice and beliefs." (Dkt.# 1 at 8 – 16).

As relief, the Plaintiff requested only injunctive relief, in the form of the Court holding "the defendants accountable for their violations of law grant [sic] remedy sought and provide an open hearing to I Mr. [sic] Tirrell Morto [sic] to present my case." (Dkt.# 1 at 16).

On October 15, 2012, Plaintiff was granted leave to proceed *in forma pauperis* and directed to pay an initial partial filing fee ("IPFF"). (Dkt.# 6). On November 16, 2012, a sum of twenty dollars ($20.00) was paid toward the plaintiff's IPFF. (Dkt.# 10). On December 6, 2012, the plaintiff filed a letter indicating that due to his transfer to a different correctional facility, he was no longer able to generate any income, and thus had insufficient funds to pay the remainder of his IPFF. Thereafter, the Court, construing the plaintiff's letter as a Motion to Reconsider, granted the same on January 6, 2013, and waived the remainder of the IPFF. (Dkt.# 14 at 2-3).

On June 14, 2013, the undersigned entered a Report and Recommendation ("R&R"), recommending that the plaintiff's complaint be dismissed with prejudice for failure to state a claim upon which relief could be granted. (Dkt.# 24). On July 3, 2013, the plaintiff filed a Motion to Amend the Complaint, Supplement and Objection Response to the Report and Recommendation. (Dkt.# 26).

By Order entered December 30, 2013, the Court granted plaintiff's Motion to Amend the Complaint, adopting in part and declining to adopt in part[4] the R&R. (Dkt.# 31). After addressing the Plaintiff's objections, the Court dismissed all of his claims against the remaining two defendants[5] except for Count Four, the double-bunking/overcrowding claim, and directed that only defendants Tomblin and Sheeley be served.[6] Summonses were issued that day.

On January 13, 2014, the Plaintiff filed another document, different from the previous one, but likewise titled Motion to Amend Complaint, Supplement and Objection Response to Report and Recommendation. (Dkt.# 34).

On February 13, 2014, the defendants filed a Motion to Dismiss. Because the plaintiff was proceeding *pro se,* on April 22, 2014, a <u>Roseboro</u> Notice was issued. On May 15, 2014, the plaintiff filed a Response in Opposition to the defendants' dispositive motion, titled Response to <u>Roseboro</u> Notice.

Therefore, this matter is now before the undersigned for review and Report and Recommendation pursuant to LR PL P 2 and 28 U.S.C. § 1915(e).

## II. <u>Contentions of the Parties</u>

### A. <u>The Amended Complaint, Dkt.# 57</u>

As noted *supra*, the Plaintiff's Amended Complaint seeks to dismiss the action as to the Eastern Regional Jail, and to proceed only against defendants Sheeley and Gov. Tomblin. Plaintiff argues that Sheeley and Gov. Tomblin were acting under state law when they violated his rights,

---

[4] After receiving the R&R and reading its recommendation on the point, the plaintiff filed the July 3, 2013 motion to amend, *inter alia,* seeking to remove the ERJ as a defendant. Accordingly, the Court declined to adopt the portion of the R&R recommending dismissal of the ERJ from the action  because the ERJ was not a "person" subject to suit under §1983, finding that plaintiff's amended complaint had rendered the undersigned's recommendation on that point moot.

[5] By oversight, the fourth of the original defendants, the West Virginia Regional Jail and Correctional Facility Authority, was not mentioned in the original Report and Recommendation.  The error was perpetuated when the plaintiff himself did not mention the Authority in his July 3, 2013 Motion to Amend, stating "[p]etitioner [sic] moves to amend his complaint by dismissing the complaint against [ERJ] . . . and just filing his suit against John Sheeley and Earl Ray Tomblin in this matter." (Dkt.# 26 at 1).

[6] Dkt.# 31 at 11.

Sheeley by being employed by the prison system and Gov. Tomblin, because he worked in the state government.

The Plaintiff contends that the defendants are deliberately indifferent to the "laws, policies, rules and regulations of the official organization and the State." He reiterates his already-dismissed First Amendment claims regarding freedom of religion in some detail. He reiterates his double-bunking/crowding claim, iterating many related problems he contends flow from it. He also reiterates many of his other already-dismissed claims regarding the temperature and quality of the food served; the lights left on constantly; inmate access to U.S.P.S. boxes; inaccessibility or insufficiency of medical care; the lack of a grievance procedure; and the many alleged hygiene and safety issues at the ERJ. Finally, he raises two new claims: the ERJ's law library is inadequate, and that after he was finally sentenced, the defendants illegally "kidnapped" him by transporting him across two different state lines while moving him from the Eastern Regional Jail to the Western Regional Jail, in retaliation against him for filing suit.

As relief, the plaintiff seeks an injunction requiring the defendants to address and correct the issues raised in his complaint regarding the ERJ. Further, he now seeks $500,000.00 in compensatory and punitive damages for his mental and emotional injury.

## B. **Defendants' Motion to Dismiss**[7]

---

[7] It is apparent from a review of the defendants' Motion to Dismiss that it addresses only the plaintiff's original complaint. In it, the defendants assert that when the Court granted the plaintiff's Motion to Amend, "[a]ll aspects of plaintiff's Complaint were dismissed with the sole exception of overcrowding allegations against these two defendants. To date, plaintiff has not served these defendants with an Amended Complaint. However, without waiving service and jurisdictional issues, the defendants move to dismiss the remaining Count 4 of plaintiff's original Complaint and any amendment made thereto." See Dkt.# 44 at 1. The undersigned notes that the Court's Order granting the motion to amend and directing that the defendants be served specified that "a copy of this Order, [and] a copy of the Complaint . . ." should be served. (Dkt.# 31 at 11). The defendants' objection to the Court's oversight in serving the original, rather than the amended complaint, would have been more properly addressed by asserting the affirmative defense of insufficient service of process in their dispositive motion, rather than using the error as an excuse to avoid answering the claims in the Amended Complaint, to which they had electronic access. Despite the defendants' assertion in their dispositive motion that they would seek dismissal of the "original Complaint and any amendment made thereto," it is clear from their dispositive motion that their motion did not address "any amendment [to the original complaint] made thereto," leaving the undersigned with an incomplete record. Not only does their dispositive motion fail to address the new claims plaintiff makes in his amended complaint, it also erroneously asserts that plaintiff is only seeking injunctive relief. (Id. at 8).

The defendants contend that they are entitled to summary judgment as a matter of law,[8] because

1) plaintiff's request to proceed IFP was premised upon material misrepresentations regarding his litigation history;

2) the plaintiff has failed to exhaust his administrative remedies;

3) plaintiff's claims are moot;

4) the defendants are entitled to qualified immunity;

5) the plaintiff has failed to state any claim against Governor Earl Ray Tomblin; and

6) plaintiff's attempt to obtain jurisdiction over Gov. Tomblin is inappropriate.

## C. Plaintiff's Response in Opposition

The Plaintiff reiterates his arguments and attempts to refute the defendants' on the same.

## III. Standard of Review

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

---

[8] The defendants' dispositive motion is titled Motion to Dismiss, not Motion for Summary Judgment, and the defendants did not attach any documents, affidavits, or other exhibits to their motion. Despite that, the defendants' Memorandum in Support of their Motion to Dismiss makes a summary judgment argument, while the Motion itself raises a motion to dismiss argument.

(2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," (<u>Id</u>). (citations omitted), to one that is "plausible on its face," (<u>Id</u>). at 570, rather than merely "conceivable." (<u>Id</u>). Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co</u>., 324 F.3d 761, 765 (4th Cir. 2003) (citing <u>Dickson v. Microsoft Corp</u>., 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. (<u>Id</u>).

### III. <u>Analysis</u>

#### A. <u>West Virginia Regional Jail & Correctional Facility Authority ("The Authority")</u>

42 U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial

capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Therefore, in order to state a claim under 42 U.S.C. § 1983, the Plaintiff must demonstrate that a person acting under color of state law deprived him of the rights guaranteed by the Constitution or federal laws. See Rendall-Baker v. Kohn, 547 U.S. 830, 838 (1982). . Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). In the alternative, a plaintiff may state a claim through a showing that a governmental entity deprived him of his rights when the cause of the plaintiff's grievance "may be fairly said to represent official policy." Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978).

Here, the plaintiff cannot establish that the Authority is a "person" for purposes of § 1983. In Roach v. Burch, 825 F.Supp. 116 (N.D. W.Va. 1993), this Court directly addressed whether the Authority was a "person" subject to suit under § 1983. After applying generally accepted factors[9] used to determine whether a State agency is "an arm" or "alter ego" of the State and, therefore, the same as the State for purposes of sovereign immunity, this Court concluded that "as the State, the Authority is not a 'person' suable under §1983." Roach, supra at 118. See also, Will v. Michigan Department of State Police, 491 U.S. 58 (1989)(finding that a State is not a "person" for purposes of § 1983); Woods v. Western Regional Jail, 2011 WL 805793 *S.D. W.Va (Feb. 4, 2011)(finding that the jail is not a person for purposes of § 1983); Cantley v. Western Regional Jail and Correctional Facility Authority, 728 F.Supp.2d 803 (S.D. W.Va. 2010)(finding that the Authority is not a "person" for purposes of a claim for money damages under § 1983). According, the plaintiff's attempt to raise a claim against the Authority pursuant to 42 U.S.C. § 1983 must be dismissed.

---

[9] Those factors were: whether its powers are substantially created by the legislature; whether its governing board's composition is prescribed by the legislature; whether it operates on a statewide basis; whether it is financially dependent on public funds; and whether it is required to deposit funds in the state treasury.

**B. John Sheeley, Administrator, ERJ, and Gov. Earl Ray Tomblin, Governor of the State of West Virginia**

In his Amended Complaint, the Plaintiff names Gov. Tomblin in his capacity as the Governor of the State of West Virginia, and defendant John Sheeley in his capacity as the ERJ's administrator. Plaintiff does not state specifically whether he is suing the defendants Sheeley and Tomblin in their official capacities, however, because while it appears he is attempting to allege that they were personally involved in the violation of his constitutional rights, it is unclear whether he intended to name them in their official capacities as well.

There is no *respondeat superior* liability under § 1983. See Monell v. Department of Social Services, 436 U.S. 658 (1978); see also Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." Vinnedge, *supra*. Nonetheless, when a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 for subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1113 (4th Cir. 1982). Similarly, a supervisor may be liable under § 1983 if the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.), cert. denied, 513 U.S. 813 (1994).[10] Because the plaintiff fails to

---

[10] Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Shaw, 13 F.3d at 799. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" Id.

allege any personal involvement on the part of these Defendants and does not make any allegations which reveal the presence of the required elements for supervisory liability, the Plaintiff fails to state a claim against defendants Gov. Tomblin and Sheeley in their official or supervisory capacity.

Plaintiff's Amended Complaint, liberally construed, asserts that the defendants Sheeley and Gov. Tomblin, as ERJ's administrator and the governor of the State, respectively, were deliberately indifferent to the Eighth Amendment violations their actions caused him. Although it is true that *pro se* petitions should be liberally construed, no matter how unskillfully pleaded,[11] here, although plaintiff names Defendant Sheeley and Gov. Tomblin as defendants, he fails to make any specific allegations against them. Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. Corp. v. Twombly, 550 U.S. 544 (2007) *quoting* Conley v. Gibson, 355 U.S. 41, 47 (1957). "And, although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant." Migdal v. Rowe Price-Fleming International, Inc., 248 F.3d 321, 326 (4th Cir. 2001) (citation and internal quotations omitted).

Assuming, as the undersigned must, when reviewing a Rule 12(b)(6) motion to dismiss, that the complaint's well-pleaded allegations are true, the undersigned looks to the Plaintiff's Motion to Amend Complaint, Supplement and Objection Response to Report and Recommendation ("the Amended Complaint")[12] for the Plaintiff's allegations regarding what capacity he intends to sue the defendants under. Plaintiff stated, in pertinent part:

> Petitioner [sic] contends that John Sheeley and Earl Ray Tomblin worked for the state, city, county or other local government at the time my rights were violated. [T]herefore this complaint applies to the defendants because they are Under Color of State Law.

---

[11] Haines v. Kerner, 404 U.S. 519, 520 (1972).
[12] Dkt.# 57.

> . . . All you need to show is that the person you are suing was working for the prison system. That would be John Sheeley he was the Jails [sic] Administrator. Or you need to show that the person you are suing was working for the State or local government. That would be Earl Ray Tomblin he is the Governor. So they were both employeed [sic] at the timeof [sic] these acts Petitioner [sic] is suing about. Which make [sic] both defendants were [sic] acting "Under Color of State Law" when Petitioner's [sic] rights were violated and both defendants were on the job exercising the power that comes from their position of authority.

(Dkt.# 26 at 1)

The Court's December 30, 2013 Order granting the Plaintiff's Motion to Amend states in pertinent part:

> As a primary matter, in and of themselves, neither employment in the prison system nor by the State of West Virginia establish that the Defendants acted under color of state law for purposes of personal-capacity liability. To be so liable, each ***Defendant must have had taken some action that caused the alleged violations of the Plaintiff's constitutional rights*** . . . Defendant Sheeley's position as the administrator of the ERJ and Governor Tomblin's employment by the State of West Virginia did not cause any such violations. These facts alone therefore are not sufficient to state a claim for personal liability . . . ***Assuming that the Defendants did approve the addition of top bunks, such approval is alleged to have caused the overcrowding at issue***. Thus, because the Complaint alleges facts showing that Defendant Sheeley and Governor Tomblin played a part in the double bunking of inmates that underlies this claim, it states a plausible basis for holding them liable.[13]

Dkt.# 31 at 8 – 9. (emphasis added). Accordingly, the Court sustained Plaintiff's objection to the R&R's determination that he had not pled a basis for liability of the Defendants as to only Claim Four of the Complaint, and dismissed the other claims in his original complaint.

State officials are considered "persons" within the meaning of § 1983 when sued in their individual capacities, and as such may be held personally liable for damages. See Hafer v. Melo, 502 U.S. 21, 31 (1991). These claims do not require proof of any policy or custom of the entity that violated Plaintiffs' rights, and qualified immunity may be raised as a defense. By its terms, Section 1983 imposes liability without defense on state and local officials who, acting under color of law in their individual capacity, deprive plaintiffs of rights created by the Constitution and federal law.

---

[13] The Court noted that "[b]ecause the Court finds that the Complaint supports a personal-capacity action, it does not reach the issue of whether it states a claim for official-capacity liability." Dkt.# 31, fn.3 at 9.

Nonetheless, the Supreme Court, drawing on common law, created absolute immunity from liability for some government officials and qualified immunity for others,  to protect officials from lawsuits for actions relating to their official duties. The Court explained the underlying rationale for immunity:

> [T]he public interest requires decisions and actions to enforce laws for the protection of the public . . . . Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity— absolute or qualified —for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.

Scheur v. Rhodes, 416 U.S. 232, 241-42 (1974).

The defendants assert that both defendant  Gov. Tomblin and John Sheeley are entitled to qualified immunity. Qualified immunity protects public officials from personal liability unless their conduct violates clearly established constitutional law. The defense rests upon two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.  Scheur, *supra* at 240. The Supreme Court recently observed that "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).  In ruling on a qualified immunity defense, the undersigned must take the facts in the light most favorable to Plaintiff and determine (1) whether facts alleged or shown by plaintiff make out violation of constitutional right, and (2) if so, whether that right was clearly established at time of defendant's alleged misconduct. Saucier v. Katz,

533 U.S. 194 (2001) (overruled in part on other grounds by <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009)).

To determine whether the defendants are entitled to qualified immunity from personal liability for Plaintiff's double-bunking claims, the undersigned examines Chapter 31, Article 20 of the West Virginia Code: West Virginia Regional Jail and Correctional Facility Authority, codified at W.Va. Code §31-20-1 *et seq.,* which states in pertinent part:

**§31-20-1a. Legislative findings and purposes.**

(a) The Legislature finds as follows:

(1) That some existing jails, adult correctional facilities . . . in this state serve neither the best interests of the incarcerated populations of the jails and facilities nor the citizens of West Virginia;

(2) That due to time constraints established and imposed by judicial decisions, it is imperative that the Legislature give immediate and diligent attention to the improvement of existing facilities and the construction and maintenance of new facilities, as well as to the development and implementation of new, innovative and effective programs dealing with incarcerated persons;

(3) That the physical condition of some existing jails, adult correctional facilities . . . contribute to a frustration of efforts to provide rehabilitation, education, vocational training, and social and psychological adjustment and improvement for incarcerated persons, with the result that those existing facilities are utilized largely for the limited purposes of confinement;

. . .

(5) That the revenues of this state, insofar as they are currently used to maintain a traditional penal system, are not efficiently utilized to provide facilities or produce programs which could direct an adult . . . inmate's or detainee's time and effort to prepare him or her for life outside of confinement**; *nor do the revenues provide corrections officials with the resources necessary to address the issues and problems with which they are confronted*.**

(b) The purposes of this article are as follows:

(1) To provide a cost-efficient system within this state for the construction, maintenance and operation of adult jails and correctional facilities;

(2) To develop and implement plans for the renovation and improvement of existing facilities and the design and construction of new facilities to better serve the incarcerated and detained . . . adult populations and the citizens of this state;

. . .

**§31-20-3. West Virginia regional jail and correctional facility authority; composition; appointment; terms; compensation and expenses.**

There is hereby created the West Virginia regional jail and correctional facility authority which shall be a body corporate and a government instrumentality. . .

The authority shall be governed by a board of nine members, seven of whom are entitled to vote on matters coming before the authority. The complete governing board shall consist of the commissioner of the division of corrections; the director of the division of juvenile services; the secretary of the department of military affairs and public safety; the secretary of the department of administration, or his or her designated representative; ***three county officials appointed by the governor, no more than two of which may be of the same political party; and two citizens appointed by the governor to represent the areas of law and medicine***. The commissioner of the division of corrections . . . shall serve in an advisory capacity and . . . [is] not entitled to vote on matters coming before the authority. Members of the Legislature are not eligible to serve on the board.

***The governor shall nominate and, by and with the advice and consent of the Senate, appoint the five appointed members of the authority . . .***
. . .

**§31-20-5. Powers and duties of the authority; bidding procedures.**

. . .

***The authority, as a public corporation and governmental instrumentality exercising public powers of the state, may exercise all powers necessary or appropriate to carry out the purposes of this article, including, but not limited to, the power:***

. . .

**(v)** ***To assume the responsibility for operation and management of regional jail facilities under the jurisdiction of the state regional jail and correctional facility authority . . .***

**(w) To exercise all power and authority provided in this article necessary and convenient to plan, finance, construct, renovate,** ***maintain and operate or oversee the operation of regional jails and correctional facilities.***

. . .

**§31-20-8. Jail facilities standards commission; appointment; compensation; vacancies; quorum.**

(a) A jail facilities standards commission of twelve members is hereby created. The

superintendent of the state police or his or her designee shall serve as chairperson of the commission and is eligible to vote on matters before the commission. ***The governor shall appoint two county sheriffs, to be chosen from a list of three names provided by the president of the West Virginia sheriffs' association, three county commissioners, to be chosen from a list of five names provided by the president of the West Virginia county commissioners' association, and one chief of police, to be chosen from a list of three names provided by the president of the West Virginia police chiefs' association.*** . . . The executive director of the regional jail and correctional facility authority, the commissioner of the division of corrections, the commissioner of the bureau of public health, the state fire marshal, and the superintendent of schools or their designees shall be members ex officio in an advisory capacity . . .

**§31-20-9. Jail facilities standards commission: Purpose, powers and duties.**

(a) The purpose of the jail facilities standards commission is to assure that proper minimum standards and procedures are developed for jail facility operation, maintenance and management of inmates for regional jails and local jail facilities. In order to accomplish this purpose, the commission shall:

(1) Prescribe standards for the maintenance and operation of county and regional jails. The standards shall include, but not be limited to, requirements assuring adequate space, lighting and ventilation; fire protection equipment and procedures; provision of specific personal hygiene articles; bedding, furnishings and clothing; food services; appropriate staffing and training; sanitation, safety and hygiene; isolation and suicide prevention; appropriate medical, dental and other health services; indoor and outdoor exercise; appropriate vocational and educational opportunities; classification; inmate rules and discipline; inmate money and property; religious services; inmate work programs; library services; visitation, mail and telephone privileges; and other standards necessary to assure proper operation: *Provided,* That the standards developed for the construction, operation and maintenance of jails apply only to jail facilities completed after April 5, 1988, and that the standards serve only as guidelines for any jail facility in operation prior to that date: ***Provided, however, That the commission shall establish standards and procedures permitting and implementing in those facilities the double bunking of inmates in all appropriate cases to the extent that this practice does not violate federal law* . . .**

W.Va. Code §31-20 *et seq.* (emphasis added).

It is apparent from a careful examination the relevant West Virginia Code sections that while the State of West Virginia ("The State") recognizes and regrets the limitations of its penal system, it is endeavoring to address those problems within the limitations of the budget allotted to it by the State. It is likewise apparent that neither the Governor nor defendant Sheeley have any direct, personal decision-making authority to approve or disapprove double-bunking of inmates. Governor

14

Tomblin's only role in the Authority is to appoint five of the nine members of the board, "no more than two of which may be of the same political party; and two citizens appointed by the governor to represent the areas of law and medicine."[14] Gov. Tomblin's only role in the jail facility standards commission[15] is to appoint two county sheriffs from a list of three names provided by the president of the West Virginia sheriffs' association, three county commissioners from a list of five names provided by the president of the West Virginia county commissioners' association, and one chief of police, from a list of three names provided by the president of the West Virginia police chiefs' association.[16] Gov. Tomblin has no direct, day-to-day responsibility for anything within the operation of the ERJ. Defendant Sheeley, as the jail's administrator, has no role in the Authority or jail facility standards commission at all, nor any direct decision-making authority to decline to accept a prisoner sent to the ERJ; unfortunately, he is compelled to accept any prisoner sent to him, no matter how crowded the jail already is, and must make do with the funds allotted to him by the State of West Virginia. Because the Plaintiff has not specified any direct acts taken by either defendant which violated his constitutional rights, the defendants are entitled to qualified immunity. Accordingly, any individual capacity claims against these defendants should be dismissed.

**C. Eighth Amendment - Prison Conditions**

In the event the Court disagrees with the undersigned's recommendations as to defendants Gov. Tomblin and Sheeley, the undersigned will also address the plaintiff's claims on the merits.

Subsequent to the filing of his complaint, Plaintiff was transferred to the Western Regional Jail in Barboursville, Cabell County, West Virginia. Because Plaintiff is challenging the defendant's deliberate indifference to conditions of confinement at ERJ, his Amended Complaint, to the extent

---

[14] W.Va. Code §31-20-3.

[15] The Jail and Correctional Facility Standards Commission is codified at W.Va. CSR §§95-1-1 *et seq.*, 95-2-1 *et seq.* and 95-3-1 *et seq.*

[16] W.Va. Code §31-20-8.

that it seeks injunctive relief, is moot. Because he is no longer housed at ERJ, he is no longer subject to the allegedly unconstitutional conditions complained of; consequently, he no longer has a legally cognizable interest in having the allegedly cruel and inhumane conditions of confinement at ERJ resolved. However, although his claims for declaratory relief should be dismissed on account of mootness, because he also seeks monetary damages, his entire case cannot be mooted and the merits of his claims must be addressed. See Williams v. Griffin, *supra* at 823. Moreover, even in the absence of a showing of actual injury, a prisoner would still be entitled to nominal damages upon proof of a constitutional violation. Gray v. Spillman, 925 F.2d 90, 93 – 94 (4th Cir. 1991).

As an initial point, because it appears that the plaintiff was a pre-trial detainee at the time of the alleged assault, his claim is governed by the Due Process Clause of the Fourteenth Amendment instead of the Eighth Amendment. Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). Nonetheless, pre-trial detainees are subject to the same protection under the Fourteenth Amendment that prisoners receive via the Eighth Amendment. Hill v. Nicodemus, 979 F.2d 987, 999 (4th Cir. 1980).

In general, the Eighth Amendment prohibits "cruel and unusual punishment." Farmer v. Brennan, 511 U.S. 825 (1994). The cruel and unusual punishment clause of the Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Wilson v. Seiter, 501 U.S. 294 (1991). The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 321-22 (1986); Estelle v. Gamble, 429 U.S. 97, 103 (1976) (*quoting* Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

Accordingly, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2nd Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates

receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard, and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. <u>Wilson v. Seiter</u>, *supra* at 297-99. To satisfy the objective element of a prison condition claim, the plaintiff must show (1) that he has sustained a serious or significant mental or physical injury as a result of the challenged condition, see <u>Strickler v. Waters</u>, 989 F.2d 1375, 1380-1381 (4th Cir. 1993); or (2) that the plaintiff's continued, unwilling exposure to the challenged condition creates an unreasonable risk of serious damage to his future health. <u>See Helling v. McKinney</u>, 509 U.S. 25, 31 (1993). In order to establish the subjective element of deliberate indifference an inmate must show that (1) the prison official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; and (2) the prison official also must have drawn the inference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).A sufficiently serious deprivation occurs when a "prison official's acts or omission . . . result in a denial of the minimal civilized measure of life's necessities." <u>Id</u>. at 298.

Therefore, an inmate's complaint, liberally construed, must properly state a claim that his prison's overcrowding and lack of sanitation are exposing him to a substantial risk of harm, thus satisfying the "objective" component of an Eight Amendment claim.[17] The issue to be decided, then, is whether the Plaintiff can demonstrate that he was at substantial risk of serious harm as a result of his unwilling exposure to the challenged conditions. <u>Helling</u>, *supra* at 31. In order to do so, the court must assess the seriousness of the potential harm, the likelihood that such injury to health will actually occur, and whether the risk violates contemporary standards of decency. <u>Id</u>. at 33 – 36.

---

[17] <u>See</u> <u>Webb v. DeBoo</u>, 423 Fed. Appx. 299 *4 (4th Cir. 2011)(*unpublished per curiam*), *vacated*, No. 2:09cv107 (N.D. W.Va.), *aff'd.* 487 Fed. Appx. 78 (4th Cir. 2012) (*unpublished per curiam*).

**Ground One:**[18] **Double-Bunking/Overcrowding**

The plaintiff contends that the defendants are "in violation of 8.10(b) [sic] A minimum floor area of 50 square feet per occupant in sleeping area and a clear floor area to ceiling height of not less than 8 feet."[19] While Plaintiff nowhere states what the actual square footage of his sleeping area was, or what the floor-to-ceiling height was, he alleges that because of double-bunking, inmates at the ERJ are so crowded that some are forced to sleep on mattresses on the floor. Further, he alleges that others have to climb up and down to the newly-added upper bunks without the benefit of a ladder. Plaintiff asserts that he personally had to sleep on a mattress with bed linens on the floor without a bedframe for over 20 months.[20]

The defendants' Motion to Dismiss contends that Plaintiff failed to exhaust his administrative remedies; however, they provide no proof of the same. Plaintiff's original complaint ambiguously states that there was no grievance procedure at the ERJ but that he did file a grievance,[21] but received no response at level 1, 2 or three.[22] He attached a letter, dated August 28, 2012, to defendant Sheeley, asserting that the ERJ does not give grievance forms to inmates, and that ERJ staff advises inmates "[w]e don't give those out anymore."[23]

It has been recognized that a prison's administrative remedies can be rendered "unavailable" for purposes of exhaustion when officials refuse to provide an inmate with required grievance forms. See Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004) (vacating a grant of summary judgment on exhaustion grounds where the defendants failed to supply any reason for the plaintiff being refused

---

[18] This was formerly Ground 4 in Plaintiff's original complaint.

[19] Dkt.# 26 at 2. The undersigned notes that there is no "8.10(b)" in the West Virginia Code of State Rules. There is, however, a W. Va. CSR § 95-2-8.10.1, but it addresses the requirements for Minimum Security Housing, specifies a minimum floor area of 60 square feet and makes no recommendation as to floor area to ceiling height.

[20] Dkt.# 26 at 2.

[21] Dkt.# 1 at 4.

[22] Dkt.# 1 at 5.

[23] Dkt.# 1 at 9.

the necessary forms); <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3rd Cir. 2003) (finding district court erred by not addressing plaintiffs' claims that prison officials failed to provide him with appropriate grievance forms); <u>Miller v. Norris</u>, 247 F.3d 736, 740 (8th Cir. 2001) (exhaustion requirement may be satisfied where prisoner raises allegations that prison officials failed to provide him with the necessary grievance forms).Accordingly, because it is unclear whether the ERJ officials interfered with Plaintiff's ability to file a written grievance, Plaintiff's claims will be given review.

As a preliminary point, "[d]ouble or triple celling of inmates is not *per se* unconstitutional. <u>Williams v. Griffin</u>, 952 F.2d 820, 824 (4th Cir. 1991), *citing* <u>Rhodes v. Chapman</u>, 452 U.S. 337 (1981); <u>Strickler</u>, *supra* at 1332 (without proof of unsanitary or dangerous conditions causing deprivation of an identifiable human need, double bunking does not constitute a cognizable Eighth Amendment deprivation); <u>Hite v. Leeke</u>, 564 F.2d 670, 673 – 74) (temporary triple-celling not *per se* unconstitutional); <u>Mathias v. Simpkins</u>, No. 7:07cv-0031, 2007 WL 1577336 * 2 (W.D. Va. May 31, 2007)("It is clear that double or triple celling of inmates is not *per se* unconstitutional."); <u>Batts v. Martin</u>, No. 87-7554, 1987 WL 38320 (4th Cir, July 1987)(unpublished); <u>Batts v. Martin</u>, No. 87-7554, (1987 WL 38320 (4th Cir. July 27, 1987)(unpublished)('Double or triple celling of an inmate does not in and of itself constitute cruel and unusual punishment."); <u>Smith v. Does</u>, No. 5:06-cv-00065, 2009 WL 205099 *4-5 (S.D.W.Va. Feb. 6, 2009) (complaints by inmates in 12-man bubble cells that they had inadequate ventilation, no desk or chair, inadequate space between beds; inadequate head space for inmates on top bunk, poor lighting, poor inmate hygiene resulting in offensive odor in the bubble housing areas, and other complaints, were not violations of the Eighth Amendment.).

Moreover, placement in a three-man cell is not an atypical or significant hardship that would entitle the plaintiff to any Due Process protections. <u>See Ihde v. Wallace, et al.</u>, No. 07-cv-714, 2008 WL 4643351 * 1 and 7 (W.D. Wis. March 26, 2008)(placement in triple cells is not an atypical or significant hardship as compared to the ordinary hardships of prison life and an inmate does not have

a liberty interest in being moved from a three-man cell)(discussing <u>Sandin v. Conner</u>, 515 U.S. 472 (1995) and <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979)).

The length of confinement under the challenged conditions is also a factor to be considered. <u>Hutto v. Finney</u>, 537 U.S. 678, 686 (1978)(noting that confinement in a "filthy, overcrowded cell and a diet of [1000 calories per day] might be tolerable for a few days and intolerably cruel for weeks or months). In <u>Beveranti v. Smith</u>, 120 F.3d 500, 504-05 & n. 5 (4th Cir. 1997), the Fourth Circuit found that inmates who were held for six months in cells that were hot, flooded with water from a leak in the toilet, infested with vermin, and smeared with urine and feces, did not state an Eighth Amendment claim based on the conditions of their confinement.

Here, Plaintiff's claim that he was compelled to sleep on a mattress with bed linens on the floor for twenty months does not state a constitutional claim. Plaintiff does not allege that he was forced to spend his entire day confined with another inmate in a single-occupancy cell; from a careful review of the limited record available, the undersigned must assume that the Plaintiff was permitted out of his cell during the day, because he references working in the kitchen;[24] serving meal trays to other inmates;[25] going to the gym;[26] eating while sitting on steps,[27] and going to the law library.[28] He does not allege that he was not provided with all of the basic necessities for daily living; although the accommodations may not have been to his liking, he does not allege he was ever deprived of food, clothing, shelter, sanitation, medical care and personal safety. It appears from the limited record available that the defendants or ERJ staff, despite Plaintiff's accusations of deliberate indifference, were as responsive to his needs as much as possible, given the circumstances.

---

[24] Dkt.# 26 at 6.

[25] Dkt.# 26 at 6.

[26] Dkt.# 26 at 4.

[27] Dkt.# 26 at 6.

[28] Dkt.# 26 at 7.

Moreover, while W. Va. CSR § 95-2-8.9.2, Multiple Occupancy, does state in pertinent part that:

> Where used, multiple occupancy rooms shall normally house no less than four and no more than 50 inmates each. Inmates shall be screened prior to admission for suitability to group living. Multiple occupancy rooms shall provide for: . . . A minimum floor area of 50 square feet per occupant in the sleeping area and a clear floor to ceiling height of not less than eight feet[,]

to the extent that the plaintiff is attempting to allege that ERJ officials violated operating procedures in in double bunking him in a single-occupancy cell, he again fails to state a due process claim. Further, while the Plaintiff has cited to many other W.Va. CSR provisions in support of his claims, notably, he fails to cite to W.Va. CSR §95-1-8.7, which states: "Double Bunking of Inmates. Double bunking of inmates is permitted to the extent that the practice does not violate federal law or standards."

To the extent that the Plaintiff is attempting to allege that the defendants did not adhere to a statute or administrative regulation, the undersigned notes that a Bivens[29] action "must be founded upon a violation of constitutional rights," Arcoren v. Peters, 829 F.2d 671, 676 (8th Cir. 1987), and "a failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater v. Robinson, 1 F.3d 1963, 1068 n. 4 (10th Cir. 1993). See also Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 U.S. Dist. LEXIS 143653 * 27 - 28 (S.D. W.Va. October 4, 2013)(even when a state policy is not followed, it does not necessarily mean there is a constitutional violation); Smith v. Atkins, 777 F. Supp. 2d 955, 965 (E.D. N.C. 2011)("the mere failure to comply with . . . [a] state regulation and jail policy [regarding suicide watches] is not a constitutional violation").

As for Plaintiff's claim that some ERJ inmates were compelled to use the upper bunks without benefit of a ladder, nowhere does he allege that he was ever required to do so, or that he (or any other inmate) was somehow exposed to a substantial risk of harm, let alone injured as a result. In

---

[29] Case law under 42 U.S.C. § 1983 is applicable to Bivens actions. See Butz v. Economou, 438 U.S. 478, 504 (1978).

this claim and several others, the Plaintiff asserts claims concerning conditions and treatment experienced by other prisoners at the ERJ. The Plaintiff does not have standing to assert claims on behalf of other inmates in the above-captioned case. See Laird v. Tatum, 408 U.S. 1 (1972); see also Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 482 (1982); Hummer v. Dalton, 657 F.2d 621, 625-626 (4th Cir. 1981)(holding that a prisoner cannot act as a "knight-errant" for others). For these claims, the Plaintiff never alleges that the incidents alleged actually happened to him, only that the incidents in these claims happened to other inmates at the ERJ. Thus, to the extent the Plaintiff is attempting to raise claims on behalf of other inmates, those allegations should be disregarded as he has no standing to bring a claim on behalf of another person.

Accordingly, because Plaintiff has neither shown a "sufficiently serious" deprivation under an objective standard, nor that prison officials acted with "deliberate indifference" to his health and safety under a subjective standard, regarding the unavailability of bunk bed ladders, he has not shown a violation of his Eighth Amendment rights. Wilson v. Seiter, *supra* at 297-99.

Plaintiff asserts that the defendants violated 95 CSR-1-13.11 [sic] by permitting overcrowding from double-bunking to result in insufficient dining staff and seating at meals, requiring inmates to eat under unsanitary conditions while sitting on the floor, stairs, or in their cells near a toilet. He asserts that sometimes he had to eat in his cell where "he shares an [sic] toilet with another inmate subjecting Petitioner's [sic] meals to be around fecal matter and urine matter." The undersigned notes that while it is regrettable that the Plaintiff had to sometimes eat in his cell or elsewhere, the mandate of W.Va. CSR §95-1-13.11, which Plaintiff quotes in his Amended Complaint,[30] is that

> [m]eals shall be served under conditions which minimize regimentation, although supervision of group dining by staff members should be available. Meals shall not be

---

[30] Dkt.# 26 at 6.

served in cells *unless it is necessary for purposes of safety and security or the inmate is under disciplinary, administrative or medical segregation*. When a meal is served in a cell a small table or shelf and appropriate seating distanced from the toilet shall be provided.

W.Va. CSR §95-1-13.11(emphasis added). The undersigned notes that if double-bunking is required for the safety and security of inmates, because of high inmate incarceration levels or because an inmate is under disciplinary segregation, as Plaintiff impliedly admits he was at one point,[31] it could sometimes require inmates to be fed in their cells. Further, as noted *supra,* "a failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater, *supra* at 1068 n. 4. Moreover, Plaintiff has neither shown a "sufficiently serious" deprivation under an objective standard, nor that prison officials acted with "deliberate indifference" to his health and safety under a subjective standard. Wilson v. Seiter, *supra* at 297-99. Therefore, there was no violation of the plaintiff's Eighth Amendment rights.

The plaintiff alleges that the overcrowding results in inadequate space for indoor and outdoor recreation, in violation of 95 CSR-1-8.19. He contends that the indoor potential exercise area of the "multipurpose room" is used by the staff for its own purposes, thus it is unavailable to inmates, and that inmates only receive one "gym call" per week. Plaintiff asserts that the defendants did not "provide this statute to the Petitioner and violated his rights to the proper outdoor outside exercise causing potential health problems such as the stint of high blood pressure the defendant was encountering [while] . . . at Eastern Regional Jail."[32]

W.Va. CSR § 95-1-8.19 states:

Exercise areas. Space outside the cell or room shall be provided for inmate exercise. Indoor and outdoor exercise areas shall be secure and available to all inmates. Outdoor areas shall have adequate space and equipment to permit regular outdoor sports activities. For jail facilities with bed capacity of more than one hundred (100) inmates, this area shall be increased in proportion to the inmate population and shall provide adequate opportunity for exercise. *Indoor exercise programs may be conducted in a multipurpose room or day room: Provided, that the space is available*

---

[31] Dkt.# 26 at 6.
[32] Dkt.# 26 at 4.

*and the location is acceptable*. Indoor space shall be an area in which lighting, temperature and ventilation is artificially controlled.

With regard to lack of recreation, an inmate must show specific harm resulting from the deprivation and a complete denial for an extended period of time. *Compare* <u>Mitchell v. Rice</u>, 954 F.2d 187, 192 (4th Cir. 1992)(seven months without out-of-cell exercise violated constitutional standards of decency), and <u>Knight v. Armontrout</u>, 878 F.2d 1093, 10-95-96 (8th Cir. 1989)(thirteen days without recreation does not rise to Eighth Amendment violation).

Here, while the Plaintiff does not explain how often he had outdoor exercise, he does not allege he was denied outdoor exercise completely. Further, he cannot show that his "stint of high blood pressure" was directly and solely attributable to the amount of exercise he received. Moreover, Plaintiff admits that he had access to the ERJ gym on a weekly basis, or at least four times per month. Therefore, aside from noting that he was denied as much recreation as he would have liked, the Plaintiff has not alleged he was denied recreation altogether, let alone alleged that he suffered any harm, let alone a specific harm, as a result. Additionally, W.Va. CSR § 95-1-8.19 specifies that inmate access to indoor space for recreation is contingent upon the space being available and the location acceptable; it follows then, that if the space is unavailable, the defendants are not required to provide it. Accordingly, Plaintiff has neither shown a "sufficiently serious" deprivation under an objective standard, nor that prison officials acted with "deliberate indifference" to his health and safety under a subjective standard. <u>Wilson v. Seiter</u>, *supra* at 297-99. Again, "a failure to adhere to administrative regulations does not equate to a constitutional violation." <u>Hovater</u>, *supra* at 1068 n. 4.

Next, Plaintiff contends that the gym at the ERJ has no air conditioning. While it is well-established that "[a]llowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment, <u>Blackmon v. Garza</u>, 484 Fed. Appx. 866, 869 (5th Cir. 2012)(*per curiam*), there is no constitutional right to air conditioning. <u>Lane v. Hutcheson</u>, 794 F. Supp. 877, 884 (E.D. Mo. 1992)(given the presence of ventilation fans and the lack of injury to the

complainant, the "ventilation system is adequate and that plaintiff's discomfort does not rise to the level of a constitutional violation."). This claim likewise does not allege any injury, let alone an injury that rises to the level of an Eighth Amendment violation. Plaintiff has not alleged that there was no air conditioning within the jail itself, where presumably, he spent most of his time, only in the gym, where, because of his once-per-week access, he could not have spent much time. Again, "the Constitution does not mandate comfortable prisons" and prisons "cannot be free of discomfort." Rhodes v. Chapman, *supra* at 349.

Plaintiff contends that because the ERJ is so overcrowded, there are insufficient toilet and shower facilities to accommodate all inmates. The Plaintiff alleges that he was on "a unit that housed more than 16 inmates at a time with only 2 showers," therefore, it was "clearly unsanitary and caused the spread of infectious diseases, germs [sic] crabs/lice, etc."[33] Plaintiff does not allege that he ever came into contact with any inmate infected or infested with any of the conditions listed.

The undersigned notes that while W. Va. CSR § 95-2-8.9.3 does mandate a minimum of one operable toilet and shower for every eight inmates, and while Plaintiff may have been inconvenienced by having to wait longer to shower or toilet than he wanted to, he has not alleged that he ever had to go without a shower or toilet. Therefore, he cannot show that he was denied "the minimal civilized measure of life's necessities," or demonstrate a constitutional violation. It does not follow that being required to wait slightly longer than usual to shower causes the spread of infectious disease or crab lice.[34] Moreover, "[p]risons are not required to provide, and prisoners cannot expect the services of a good hotel." Powell v. Federal Bureau of Prisons, 1:08cv199, 2009 WL 3160124 *4, Goodwin, CJ (S.D. W.Va. Sep. 25, 2009). Accordingly, Plaintiff has not established either the

---

[33] Dkt.# 26 at 1.

[34] Moreover, the undersigned finds it unlikely that the Plaintiff was actually in danger of being exposed to crab lice, given that "Policy and Procedure Statement 17001 . . . sets forth the official Inmate Admission Procedures promulgated by the WVRJA. Procedure J of 17001 provides that "[e]ach inmate committed to a regional jail facility will be required to delouse and shower prior to being placed in a housing unit. *Policy and Procedure Statement*, at 8." Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 U.S. Dist. LEXIS 143653 * 27 (S.D. W.Va. October 4, 2013).

objective or the subjective component of an Eighth Amendment claim; thus this issue does not rise to the level of a §1983 claim.

Plaintiff alleges that overcrowding also results in insufficient foot lockers for storage of inmates' personal property and court papers. Plaintiff's allegation that there are insufficient number of foot lockers for storage in the ERJ is insufficiently-pled.[35] He has not alleged that he was ever denied access to a place to store his belongings, or that he suffered any harm or deprivation as a result of the lack of personal storage. Accordingly, Plaintiff has neither shown a "sufficiently serious" deprivation under an objective standard, nor that prison officials acted with "deliberate indifference" to his health and safety under a subjective standard. Wilson v. Seiter, *supra* at 297-99. Therefore, he has not stated a claim for relief under §1983.

Finally, Plaintiff contends that overcrowding causes pre-trial detainees like himself to be celled with federal inmates,[36] with other inmates on disciplinary segregation,[37] and with inmates with TB, Hepatitis C, Scabies, Flu, Bi-polar Anxiety, etc."[38] This, however, is not an atypical or significant hardship that can give rise to a due process violation. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997)(holding that administrative segregation for six months with vermin, human waste, flooded toilet, unbearable heat, cold food, dirty clothing, no outside recreation, and no education was not so atypical as to impose a significant hardship). Plaintiff does not allege that he

---

[35] Pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, "[a] pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim *showing that the pleader is entitled to relief*, and (3) a demand for judgment for the relief the pleader seeks." (Emphasis added) "And, although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant." Migdal v. Rowe Price-Fleming International, Inc., 248 F.3d 321, 326 (4th Cir. 2001) (citation and internal quotations omitted).

[36] Dkt.# 26 at 2.

[37] Dkt.# 26 at 6.

[38] Dkt.# 54 at 3.

ever suffered any harm from being housed with inmates who had other physical or mental illnesses, other than a vague claim of "mental anguish." While W.Va. CSR §95-1-19.3 does specify that

> [t]he jail facility shall provide for the separate management of the following categories of inmates: . . . (b) Pre-trial and convicted inmates; (c) Felon and misdemeanant; . . . (f) Inmates with special problems (alcoholics, narcotic addicts, mentally ill persons, physically disabled persons, or persons with communicable diseases); (g) Inmates who require disciplinary detention; [and] (h) Inmates who require administrative segregation[,]

to the extent that the plaintiff is alleging that ERJ officials violated operating procedures in incarcerating him with other categories of inmates, he again fails to state a due process claim. "[A] failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater v. Robinson, *supra* at 1068 n. 4.

In sum, as stated in Wilson v. Seiter, *supra* at 304, while overcrowding accompanied by unsanitary and dangerous conditions can constitute an Eighth Amendment violation, provided that an identifiable human need is being deprived, here, plaintiff has failed to show he was ever subjected to any unsanitary or dangerous condition, or denied access to a basic resource, such that it rose to the level of an Eighth Amendment violation. Moreover, because plaintiff has shown no personal involvement on the part of the defendants, and can show no harm, he cannot prove the defendants were causally connected to anything he alleges occurred. Zatler, *supra* at 401.

**Ground Two: ERJ's Inadequate Law Library**

Plaintiff contends that the defendants violated 95 CSR§1-15.3, because the ERJ's law library denies him legal access, because it does not provide all necessary legal materials necessary; is too small in size; and inmates are not given enough time in the library, denying inmates, including him, of the right "to research his criminal or civil matters[.]"

Inmates have a general constitutional right to "adequate, effective and meaningful" access to the courts. Bounds v. Smith, 430 U.S. 817, 822 (1977). "The fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of

meaningful legal papers by providing prisoners with adequate law libraries, or adequate assistance from persons trained in the law." Id. at 828. However, in Lewis v. Casey, 518 U.S. 343, 351 (1996), the Court held that since inmates have no "freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by" challenging the adequacy of a prison's law library or legal assistance program. The Court further held that "the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Id. Actual injury sufficient to sustain a cause of action for denial of access to the courts is present where, for example, an inmate deprived of legal materials is unable to meet court imposed deadlines as a result of the deprivation. See Roman v. Jeffes, 904 F.2d 192, 198 (3rd Cir. 1990).

Here, a review of the docket reveals that despite ERJ's law library inadequacies, in the one month before he was transferred to the Western Regional Jail on or about November 13, 2012,[39] the Plaintiff was able to research, draft and file his original complaint; a motion to proceed IFP; a Consent to Collect; a copy of his Prisoner Trust Account Report ("PTAR"); and a Motion for Transfer to Eastern Regional Jail and Notice of Address Change. Accordingly, not only has the Plaintiff failed to even allege any injury in connection with this claim, he cannot prove that he has suffered any injury as a result of ERJ's allegedly inadequate law library. Accordingly, because the plaintiff has not shown that he has suffered any specific harm or prejudice to his right of access to the courts as a result of the allegedly inadequate ERJ law library, he fails to state an access to the courts claim upon which relief can be granted.

Finally, a federal court lacks authority to "give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895). A case becomes moot when the "issues presented are no

---

[39] See Plaintiff's November 13, 2012 letter to the Clerk of Court, advising of address change. Dkt.# 9.

longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Murphy v. Hunt</u>, 455 U.S. 478, 481 (1982) (*quoting* <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 333, 396 (1980). Where an inmate seeks injunctive relief from an allegedly unconstitutional prison condition, the prisoner's subsequent transfer from that prison renders the claim moot.

Here, it is apparent from even a cursory review of the Plaintiff's Amended Complaint that it is merely a laundry list of claims based on State statutes Plaintiff contends were violated, that fails to explain how any individual defendant violated his rights. Further, the plaintiff has alleged no personal serious or significant physical or emotional injury resulting from any of the challenged conditions. <u>Shakka</u>, *supra* at 166. Because plaintiff has not stated, let alone proven constitutional violations against either defendant Sheeley or Gov. Tomblin, his claims for monetary damages against either defendant are moot as well.

**Ground Three: <u>Illegal Kidnapping and Retaliatory Transfer</u>**

The plaintiff claims that the defendants retaliated against him for filing suit by transferring him from the Eastern Regional Jail, in Berkeley County, to the Western Regional Jail, and in doing so, took him across two states lines, "which is illegal and kidnapping."[40]

In order to sustain a claim based on retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir.1994). Therefore, "*in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B)]." <u>Id.</u>

---

[40] In the Plaintiff's second Motion to Amend, he alleged that this transfer violated the Uniform Criminal Extradition Act. The Uniform Criminal Extradition Act, promulgated at W.Va. Code §§ 5-1-7 to 13, is irrelevant here. It is true that a prisoner incarcerated in a jurisdiction like West Virginia that has adopted the Uniform Criminal Extradition Act is entitled to the procedural protections of that Act before being transferred to another jurisdiction pursuant to Article IV of the Agreement on Detainers. <u>See</u> <u>Cuyler v. Adams</u>, 449 U.S. 433, 443-50 (1981). Here, however, the Plaintiff was not a "prisoner" in the sense contemplated by the Uniform Criminal Extradition Act, because he was not a fugitive from justice being transferred to another jurisdiction when he was transferred to the Western Regional Jail in Cabell County from the ERJ in Berkeley County, West Virginia. He was merely a duly-convicted West Virginia prisoner being transferred from one facility to another within the state. As such, even if other state lines were crossed incident to the transfer, it did not invoke the Uniform Criminal Extradition Act.

Furthermore, claims of retaliation are treated with skepticism in the prison context.  Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir.1996).  Additionally, "a plaintiff alleging that government officials retaliated against her in violation of her constitutional rights must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights. "  American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md.,  999 F.2d 780, 785 (4th Cir. 1993).

Prison officials are to be given deference regarding the execution of prison policies and practices.  Bell v. Wolfish, 441 U.S. 520 (1979).  Correctional officials' expertise in operating and maintaining safety in detention facilities is entitled to substantial discretion "to devise reasonable solutions to the problems they face."  Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1513 (2012).  Furthermore, "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise."  McKune v. Lile, 536 U.S. 24, 40 (2002) (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)). Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison."  Gatson v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991).

Here, plaintiff asserts that he was a pre-trial detainee while at the ERJ,[41] and that after he was sentenced, he was transferred away from the ERJ.[42]  Thus, it is apparent from the record that the reason for the transfer was because the plaintiff was finally convicted and sentenced, and was being transferred to a facility elsewhere in the state to serve his sentence, not because he was being retaliated against.  The transfer did not violate a constitutional right; thus Plaintiff has not established a retaliation claim. Adams v. Rice, *supra* at 75.

Because the Plaintiff is in the custody of the Authority, the decision as to his place and type of incarceration, and the travel thereto, is within its purview alone. This Court has no authority or

---

[41] Dkt.# 26 at 1.

[42] Dkt.# 26 at 7.

jurisdiction to direct the Authority to keep the plaintiff in any particular facility for any length of time, as Plaintiff seems to impliedly request. Accordingly, because an inmate has no constitutional right to be assigned to any particular prison, Plaintiff cannot assert any right is violated if the Authority makes a decision to transfer him to another facility, and he has failed to state a claim under §1983.

## IV. <u>Other Matters</u>

Finally, the undersigned further notes that the defendants' claim that plaintiff misrepresented his litigation history in an effort to proceed IFP in this case, thus his permission to proceed IFP should be "revoked," has no basis in fact or law. The defendants argue that in

> his application at Page 13, plaintiff expressly denied being involved as a plaintiff in any other lawsuit. He denied that any prior lawsuit was dismissed. He failed to produce copies of any prior lawsuits . . . [plaintiff previously filed] an action against the Martinsburg City Police Department and Berkley [sic] County Sheriff's Department and various officers on, or about October 19, 2012. This action was filed [in this district as] Civil Action No. 3:12-CV-00126 . . .Plaintiff failed to disclose this case and plaintiff failed to disclose the fact that this case was dismissed with prejudice over his objections when he made his application to proceed *in forma pauperis* in the present case.

Dkt.# 44 at 4.

Setting aside for the moment that the court-approved form application to proceed IFP in this district that the plaintiff submitted is only a four-page document with no "Page 13," nowhere on the IFP application is a *pro se* plaintiff asked anything at all regarding his prior litigation history, let alone if he was ever "involved as a plaintiff in any other lawsuit." The IFP application *only* asks what financial assets a plaintiff has available for use in paying the filing fee. To the extent that the defendants are attempting to refer to §IV, Previous Lawsuits and Administrative Remedies, on *Page 5* of this district's court-approved form §1983 State Civil Rights Complaint, which *does* ask about prior litigation, the question asked is "[h]ave you filed other lawsuits in state or federal *court dealing*

*with the same facts involved in this action?*" (emphasis added). The plaintiff answered "No."[43] The undersigned finds that the plaintiff answered the question truthfully, because it is apparent from the defendant's own Motion that the previous case Plaintiff filed is against an entirely different set of defendants, and a review of that record indicates the case has nothing whatsoever to do with the conditions at the ERJ.

## V. Recommendation

In consideration of the foregoing, it is the recommendation of the undersigned that the defendants' Motion to Dismiss (Doc. 43) be GRANTED, and the plaintiff's Complaint **DISMISSED with prejudice for failure to state a claim upon which relief can be granted.**

Further, the undersigned recommends that Plaintiff's pending second Motion to Amend Complaint, Supplement and Objection Response to Report and Recommendation (Dkt.# 34) be **DENIED as moot**.

**Within (14) fourteen days** after being served with a copy of this Report and Recommendation, **or by July 17, 2014,** the plaintiff may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based on such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket, and electronically to all counsel of record.

---

[43] Dkt.# 1 at 5.

DATED: July 3, 2014

/s/  James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE